(C. D. 236)

WILLIAM STECK & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 20, 1939)

*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Joseph E. Weil* and *Daniel I. Auster*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

KINCHELOE, Judge: The merchandise here in controversy is invoiced as 149 bales Flax Waste, bearing the mark "J" in a diamond, and numbered 1 to 149. It was assessed for duty by the collector at Charleston, S. C., as flax noils under paragraph 1001 of the Tariff Act of 1930, at 1 cent a pound. Plaintiff has protested such classification, claiming the merchandise to consist of material suitable only for paper making, and therefore free of duty under paragraph 1750 of said act, as paper stock. The protest was subsequently amended to claim alternatively that the merchandise is dutiable under paragraph 1555, as waste not specially provided for, at 10 per centum ad valorem.

The importation was made by William Steck & Co., Inc., of New York, dealers in all kinds of waste material, such as flax, linen, jute, waste paper, rags, etc. The merchandise was shipped by Etabliss-

ments Francois Chemay, of Ghent, Belgium, by the steamer *Shick-shinny* from the port of Antwerp, and arrived at the port of Charleston, S. C., August 13, 1933. From there it was shipped by rail to the Cannon Mills, at Kannapolis, N. C., who were the purchasers of the merchandise from the importing firm.

During the course of the trial counsel for the Government moved for a dismissal of this protest on the ground that the record as then made did not show that the classification of the merchandise as made by the collector was erroneous, or that the merchandise was classifiable as claimed, which motion was taken under advisement by the court (R. 73/4). This motion is now overruled, with an exception to counsel for the Government.

It appears from the testimony of Arthur Rosenfeld, a member of the importing firm, that they did not see the merchandise upon arrival, as they had negotiated a sale of it to the Cannon Mills before importation. He stated that a sample had been submitted to his firm by the shipper in Europe, and that his firm in turn sent the sample to the Cannon Mills, on which the sale to them was made, and that the shipper was then ordered to send the merchandise to Charleston, S. C., that being the nearest port to Kannapolis, N. C.; that upon arrival of the goods at the plant of the Cannon Mills at Kannapolis it was found that they were not the same as ordered, and that under date of September 6, 1933, the Cannon Mills rejected the merchandise in a telegram to William Steck & Co., Inc., the importing firm, reading: "RECEIVED SHIPMENT NOILS CONTAINING COLORED WASTE CANNOT USE SAME WRITING." With this telegraphic rejection the Cannon Mills also forwarded to the Steck Co. a composite sample of the merchandise taken from 50 out of the 149 bales of the importation, which sample is in evidence herein as Exhibit 2. The witness stated further that his firm thereupon notified the shipper abroad about the rejection, and it appears that after the exchange of several cablegrams the shipper agreed to compromise the matter by making the importing company an allowance in the price, as per Collective Exhibit 1 and Exhibits 3, 4, 5, and 6. Thereupon, the importer sought another outlet for the rejected merchandise and sold it to the Wardlow Thomas Paper Co., Middletown, Ohio, and the Cannon Mills were instructed to ship same to this paper company (R. 14).

William Charles Steck, also a member of the plaintiff company, testified that he has been dealing in every kind of waste used for spinning or for paper making for 32 years, and is familiar with the merchandise here in question; that he visited the Wardlow Thomas Paper Co. after the shipment had been resold to them; to verify if Exhibit 2 was correctly representative of the lot. He described the source of flax noils as follows: "It comes from a spinning mill. The mill using

the flax, takes the flax and cleans it. It means a residue. Taking the residue and putting it through a combing machine, and picking out the noil." Again, that "In spinning flax there must be some drops, and they take the drops and put them in a combing machine to comb out the dirt, and that is the noil; it is short but clean" (R. 22, 23, 43). He stated that Exhibit 2 was full of colored cotton threads, and was not flax noils, and that in all his experience he has never offered such merchandise to a spinning mill, and that the only outlet he has ever known for such merchandise was to paper mills.

At this point counsel for the Government introduced in evidence as Exhibit 7 a small sample weighing less than 1 ounce, being all that was now left or available of the official sample of about 8 ounces originally taken by the Government official at Charleston out of bales numbered 1 to 15 of the importation. Counsel for the plaintiff did not question the fact that it was a part of the official sample, but did question its representative character (R. 39).

Witness Steck then stated that Exhibits 7 and 2 are not comparable; that Exhibit 7 is the "dropping from the combing machine, not the result of the combing process"; that while he has sold such merchandise as flax noils, they have had rejections; that Exhibit 7 is a low grade of flax noils and that it is of a different stock entirely from what he saw on the premises of the Wardlow Thomas Paper Co.; that he verified the marks and the numbers on the 149 bales as comprising the shipment from the Cannon Mills, and that Exhibit 2 correctly represents the merchandise; that Exhibit 2 has none of the characteristics of flax noils other than that it is a flax waste.

The first witness, Rosenfeld, was then recalled by plaintiff, and testified further, after examining Exhibit 7, that this sample does not represent the shipment in question, and that it is entirely different from the sample on which he originally made the sale to the Cannon Mills. After examining Exhibit 2 he stated that he never negotiated a sale of material like that to any spinning mill, and that in all his experience he never discovered any other outlet for such merchandise than a paper mill; that he has bought and sold flax noils, and that Exhibit 2 has none of the characteristics of flax noils. He also stated that he would consider Exhibit 7 a low-grade type of flax noil; that in a shipment of 149 bales of waste it is possible there may be a handful of material like that, but that such a small handful would not be representative of the shipment (R. 47/50).

George D. Burns, another witness called by plaintiff, stated that he has been a dealer in raw material supplies for paper mills, such as fibers of various sorts, for 20 years, and is familiar with the various sources of supply and the various outlets for the merchandise (R. 52); that he has bought and sold flax fibers, such as flax noils, card waste, etc., and has sold such merchandise to spinning mills and to paper

mills. When shown Exhibit 2 he said he never purchased or handled merchandise of that character; that it is a mixed waste, and contains jute and cotton; that he would not offer such merchandise to a spinning mill, but to a paper mill. He further stated that he has seen flax noils produced in spinning mills, and that they are the result of a combing process after the flax has been hackled and carded (R. 53); that Exhibit 2 has lost its identity as a particular grade of flax, other than being a mixed mill waste; that isolated specimens of flax noils might be in there, if it could be sorted, but that it is too much of a mixture to be segregated; also that he would not call Exhibit 2 flax noils, and that it has not the characteristics of flax noils. After examining Exhibit 7 the witness stated he could make a guess as to what it was, but would never attempt to buy or sell a waste of any kind on such a small sample (R. 55); that his guess would be that it is a low-grade flax noil, but would need a larger sample to be sure; that a low-grade flax noil is a waste, but that a flax noil is not a waste (R. 55). The witness further stated that noils have been used for paper making, but only when the normal supply of flax cuttings and linen threads was very scarce, and that as a general proposition paper mills do not use flax noils, and that the preponderant use of flax noils is for spinning (R. 56).

Ray A. Holshouser was the fourth witness for the plaintiff. He is superintendent of the carding and spinning operations of the Cannon Mills, at Kannapolis, N. C., manufacturers of towels, sheets, and pillow cases. He testified that while they use cotton as raw material, they use flax noils in one of their mills. He has been with the company for 23 years, and has taken a textile course at the State College at Raleigh. His duties cover the receipt of the raw materials and the processing of them up to the spinning of the yarns. Bales of flax noils received at the mill are first inspected by him before they are unloaded from the car (R. 96). The witness stated he is not an expert on flax noils, but knows what they can use and what they cannot use. That some time in September 1933 the mill received a consignment of 149 bales of flax fibers from William Steck & Co., Inc., New York; that he personally examined 50 bales of the shipment, and found colored threads or strands in them; that the merchandise could not therefore be used by them on that account, and that the lot was therefore rejected by telegram (Collective Exhibit 1), and that at the same time a composite sample (Exhibit 2), taken by him out of the 50 bales he examined, was forwarded to William Steck & Co., Inc., the importer; that they would not have rejected the merchandise if it had been the same as Exhibit 7, which the Government introduced as the official sample of the merchandise taken at the port of Charleston from bales 1 to 15. The witness stated further that Exhibit 7 is ordinary flax noils, while Exhibit 2 is poor flax noils

(R. 102); that it was the colored parts in Exhibit 2 that they objected to; that the colored part was pieces of cotton yarn, and that cotton yarn is not noils; and that while the percentage of colored cotton threads was small, it nevertheless bleaches the towels, and for that reason cannot be used (R. 104). He stated that there were no pieces of colored thread in Exhibit 7.

Under cross-examination this same witness testified further that when the shipment arrived at their mill from William Steck & Co., Inc., he went out to the car and inspected it; that he first examined one bale, and found this colored waste, and then had 50 bales unloaded and opened by his truckmen; that he did not notice the markings on the bales, but was notified by the purchasing department that there were 149 bales received; that the rejection of the merchandise was based upon the examination made of said 50 bales alongside the track; that said bales were completely opened up, and then rebaled. The witness did not know the numbers that were on the bales he opened, but that according to the invoice the bales were numbered 1 to 149; that he could not say whether any of the bales he examined were out of numbers 1 to 15; that the 50 bales were out of the 149-bale lot, but could not tell which particular numbers.

Clarence O. Brown, acting appraiser and examiner of merchandise at the port of Charleston, was called as a witness by the Government. He testified that he has examined flax waste and flax noils since 1924, and that he examined the merchandise designated for examination in the present instance, which were bales numbered 1 to 15 out of the importation of 149 bales, as shown by the summary sheet with entry 44 covered by this protest. He described his method of examination and sampling as follows:

This sample (exhibit 7) constitutes a small portion from 15 bales of the lot of 149 bales of flax waste. In sampling this merchandise we took a portion of each of the 15 bales, taken from various parts of the bale. This sample is a pretty small part of the sample that was taken from various parts of the bales. This sample here is a part of it. It is a small part that was taken from the various bales and which was all put together, and when put together it was taken apart and one part sent to the Customs Information Exchange for classification or verification of classification, and for a report, by me. When the protest was received a part of the sample that was retained was taken and sent to the Custom House. And that is this sample (R. 77).

Mr. Brown stated further that Exhibit 7 correctly represents the 15 bales that he examined; that the remainder of the sample that he took is no longer available, as subsequently it was destroyed together with a lot of other samples which had accumulated up to 1935, and that he was not mindful at the time that this shipment was under protest (R. 79). After examining plaintiff's sample, Exhibit 2, he stated that he could not say that that sample, or any part of it, came out of bales 1 to 15, which he had examined; that Exhibit 2 contains a lot more of

waste than Exhibit 7, and that it is not representative of bales 1 to 15; and that he did not examine the remainder of the 149 bales, except as to quantity. He stated further that after drawing samples they are kept in his custody, and that just as soon as a protest is received the sample is turned over to the assistant collector, who in turn forwards same to this court, but that he does not know what might have happened to the samples between the time he turned them over to the assistant collector and the time they were sent to the Customs Court (R. 88). The witness further stated that he does not often find colored pieces and wads of cotton in flax noils, such as present in Exhibit 2; also that while he believed the merchandise as represented by Exhibit 7 to be flax noils from information he received from time to time from the Customs Information Exchange, he nevertheless sent a sample to said bureau and received their report on Customs Form 6431–A confirming his own views.

James Richard Murphy, factory superintendent of the Linen Thread Co. of Paterson, N. J., was the only other witness called by the Government. He stated he has held such position for 25 years, namely, 7 years at the Paterson mill, 8 years in the company's Massachusetts mill, and 10 years in one of the company's mills in Northern Ireland. He has been familiar with flax noils for 30 years, and stated that it is the byproduct of the flax tow combed, and that flax tow is a byproduct of the hackling machine, and that hackling is the combing of the shorter parts of the flax, straw, and dirt, which byproduct is called tow; that the byproduct of tow is then subjected to some other process; that the best of the tow is carded, and only the inferior part is combed, resulting in flax noils (R. 60). He has also handled flax noils and seen them made. When shown Exhibit 7, the witness said it was noils handled over and pulled; that it is not like the original things that came out of the bales, but that there is enough there to tell what it is, and that it is flax tow noils; that Exhibit 2 is a mixture of waste, and that some of it is flax noils. On cross-examination the witness said his testimony with regard to noils was from his experience in Ireland; that the first process of flax in the mill is hackling, which takes off the nonfibrous parts of the flax plant; that after it is hackled it goes to a spreadboard, which forms it into a sliver; that all his experience has been in the ultimate production of linen sewing thread, as also flax yarn, for which they want the better quality of flax; that in the waste from the carding machine there is a lot of straw and dirt, whereas there is not nearly so much dirt in noils, although there may be a lot of straw (R. 65), depending on the kind of tow that is being used; that noils are six or seven times the value of card waste (R. 65, 66). On redirect examination the witness further testified that he never saw flax noils made in this country, but has seen samples of them, and that 99 per centum of the flax noils are

imported; that some of the samples of flax noils that he has seen in this country have been like Exhibit 7, and some have not (R. 68).

It will be seen from the foregoing testimony that the issue for our determination is not only one of the proper classification of the imported merchandise, but also involves the reliability and sufficiency of the samples of the merchandise put in evidence as Exhibits 2 and 7, as representative of the merchandise or part thereof. The contention of the plaintiff on the latter point is that Exhibit 7 was either not taken from the instant importation, or that it was too small to base a classification thereon, while the Government contends that plaintiff's Exhibit 2 does not represent the merchandise in question, and intimates that it may not be out of the shipment in question.

In our opinion, however, the record fairly establishes that the official sample (Exhibit 7) taken by the Government from bales 1 to 15 of the importation can be taken as correctly representing the character of the merchandise in those bales, as to which it is also shown that it consists of flax noils, although perhaps of poor quality. However, as testified by plaintiff's own witness Holshouser, superintendent of the Cannon Mills at Kannapolis, N. C., the original buyers of the merchandise from the importing firm of William Steck & Co., Inc., they never would have rejected the shipment as flax noils if it had been the same as Exhibit 7.

We think it is also established with equal certainty that plaintiff's sample, Exhibit 2, correctly represents the 50 bales of the shipment opened up and examined at the time of its arrival at the Cannon Mills. As to the character of the merchandise in such bales, it is unquestionably shown by the record to be entirely different from Exhibit 7, and contains pieces of different colored cotton threads and wadding, also some jute, and that it has none of the characteristics of flax noils, other than being a mixed mill waste. Government witness Murphy himself stated it was a mixture of waste. The uncontradicted testimony of plaintiff's witnesses also shows that such merchandise is never used by or sold to spinning mills for spinning or weaving purposes, but that the only outlet for such material during all their experience, before and after the date of the Tariff Act of 1930, has been to paper mills for paper making.

The intimation of plaintiff's attorneys that the Government may have drawn its sample, Exhibit 7, from some other importation of flax waste at Charleston by mistake, and the intimation on the part of the Government's attorney that the merchandise shipped by the importing firm to the Cannon Mills, at Kannapolis, N. C., out of which importer's sample, Exhibit 2, was taken, may not have been from the same merchandise as that covered by the entry before us, certainly have no real basis in fact so far as the record discloses, and will therefore be disregarded.

The pertinent facts remain, however, that the 15 bales actually examined and sampled by the Government are shown to be flax noils properly dutiable as herein assessed, and that the 50 bales of the same importation examined and sampled by plaintiff's witnesses are shown to be a mixture of flax waste used chiefly, if not exclusively, for paper making. What the character of the remaining 84 bales of the shipment of 149 bales actually was is not shown, other than that the whole shipment on a resale went to a paper mill. This fact would, of course, not be sufficient to prove that the said remaining 84 bales were flax waste used chiefly as paper stock, or that they were not in fact flax noils the same as bales 1 to 15.

On the record presented and under the circumstances and facts in this case we are of opinion, and so hold, that the plaintiff has proven that at least 50 bales of the importation consist of mixed flax waste free of duty under said paragraph 1750 of the act of 1930, as paper stock. To this extent the protest is sustained on the basis of the average weight of all the bales in the importation. The protest is, however, overruled as to all other merchandise and on all other grounds.

Judgment will be rendered accordingly. Note *Alfred Bloch & Co., Inc.* v. *United States*, T. D. 49407.